[Cite as *Gibson Bros., Inc. v. Oberlin College*, 2022-Ohio-1079.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

GIBSON BROS., INC., et al.

    Appellees/Cross-Appellants

v.

OBERLIN COLLEGE, et al.

    Appellants/Cross-Appellees

C.A. Nos.    19CA011563
                20CA011632

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    17CV193761

DECISION AND JOURNAL ENTRY

Dated: March 31, 2022

---

CARR, Judge.

**{¶1}** Appellants, Oberlin College and its Dean of Students, Meredith Raimondo (collectively "Oberlin" or individually "the college" or "Raimondo"), appeal from a judgment of the Lorain County Court of Common Pleas that entered judgment against them and awarded compensatory and punitive damages to Gibson Brothers, Inc., Allyn W. Gibson, and David R. Gibson[1] (collectively "the Gibsons"). The Gibsons cross-appealed the trial court's reduction of damages that the jury had originally awarded them. This Court affirms.

I.

**{¶2}** This case has a lengthy history, including more than one year of pre-trial proceedings, an almost six-week jury trial, a separate trial on punitive damages, and several post-trial motions and rulings. Although this case was initiated on November 7, 2017, with a 33-page

---

[1] David R. Gibson died shortly after this appeal was filed and was replaced by his estate as a party to the appeal.

complaint, alleging numerous claims against each of the defendants, only three of those claims (libel, intentional interference with business relationship, and intentional infliction of emotional distress) were ultimately decided by the jury and are at issue in this appeal.

**{¶3}** This Court recognizes that this case has garnered significant local and national media attention. The primary focus of the media coverage, and the several amicus briefs filed in this case, has been on an individual's First Amendment right to protest and voice opinions in opposition to events occurring around them locally, nationally, and globally. This Court must emphasize, however, that the sole focus of this appeal is on the separate conduct of Oberlin and Raimondo that allegedly caused damage to the Gibsons, not on the First Amendment rights of individuals to voice opinions or protest.

**{¶4}** When this case went to trial, the student protests were not a subject of this defamation case, but merely provided a background for how other, potentially defamatory speech arose and was disseminated. Moreover, as will be explained in much greater detail in this opinion, prior to allowing the jury to consider whether any written statements were actionable, the statements were reviewed by the trial court (and will be again by this Court on appeal) under modern defamation law, which explicitly protects First Amendment free speech.

**{¶5}** "The First Amendment generally prevents government from proscribing speech * * *." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). However, "[o]ur society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, [such as defamation,] which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" (Citation omitted.) *Id*. at 382-383. "Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, [however,] demands that the law

of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). Since the 1960s, to provide greater protection to First Amendment rights to free speech, the United States Supreme Court has "narrowed the scope of the traditional categorical exceptions for defamation[,]" noting that actionable categories of defamation are "not within the area of constitutionally protected speech[.]" (Internal citations omitted.) *R.A.V.* at 383.

{¶6} This Court begins by reciting facts relevant to this appeal, emphasizing that many of these facts are recited only for the purpose of providing the background under which this controversy arose. Gibson's Bakery is a bakery and convenience store located in Oberlin, Ohio, close to the college campus. It has been run by the Gibson family for more than 130 years and has had a long-standing relationship with the college, its students and employees, and the surrounding community. At the time this controversy began, the bakery was owned by Allyn W. Gibson, often referred to during this litigation as Grandpa Gibson, and his son, David R. Gibson. During this controversy, David's son, Allyn D. Gibson ("young Allyn"), was an employee at the bakery but had no ownership interest. Young Allyn is not a party in this case.

{¶7} As stated in the testimony of current and former Oberlin administrators, Oberlin College is a private liberal arts college and conservatory of music that has been operating in Oberlin, Ohio since the 1830s. When this dispute arose, many Oberlin students had been protesting and otherwise expressing their dissatisfaction with the treatment of people of color by the college.

{¶8} The controversy in this case arose following an incident at the bakery on November 9, 2016. Although media coverage may have included other details about the incident, this Court is confined to reviewing the record before us on appeal. *See In re G.D.*, 9th Dist. Summit No. 27337, 2014-Ohio-3476, ¶ 4. According to the testimony admitted at the hearing, three African

American Oberlin students (one male and two females) were in the bakery while young Allyn was working. Young Allyn later informed the police that he confronted the male student because he believed that the student was shoplifting wine and using a fake I.D. to purchase more alcohol; that the male student fled the store; and young Allyn chased him across the street to apprehend and detain him for the police to arrive. When a police officer responded to the scene, he observed that the two female students also became involved in the physical altercation between young Allyn and the male student. The police arrested the three students. The students eventually entered guilty pleas and were convicted for their roles in the incident.

{¶9} Several college administrators testified that rumors about this incident at the bakery quickly reached members of the student body. Because many Oberlin students apparently believed that the three students had been racially profiled by young Allyn, they announced that they planned to hold a protest outside the bakery beginning at 11:00 a.m. the following day. Although the record does not disclose details about who prepared the flyer, a one-page flyer was prepared to be distributed during the protests. The flyer urged a boycott of the bakery, asserting that it was a "RACIST establishment with a LONG ACCOUNT OF RACIAL PROFILING and DISCRIMINATION." (Emphasis in original.) The flyer also gave an account of the "heinous event involving the owners of this establishment" and stated that "Allyn Gibson" had racially profiled the male student, improperly chased him out of the store, and assaulted him.

{¶10} Raimondo learned about the planned protest shortly before it began. Early that morning, she met with other administrative and faculty members of the college and several of them attended the protests. The parties would ultimately dispute what role, if any, Raimondo and other college staff played in the distribution of the flyer at the protests. It was not disputed, however, that Raimondo, as the Dean of Students, attended the protests. Her testimony and the written

policy of the college stated that Raimondo had the responsibility to appear at off-campus student protests to attempt to maintain peace.

{¶11} The testimony of witnesses at trial indicated that 200 to 300 people demonstrated outside the bakery on November 10 and November 11, 2016. Although the student protests are not a subject of the Gibsons' defamation claims at this stage of the proceedings, the flyer that was distributed during the protests is central to this litigation. The flyer and its distribution will be discussed in more detail in this Court's disposition of the first assignment of error.

{¶12} The student senate held a meeting on the evening of November 10 and passed a student senate resolution ("Senate Resolution"). The student senate sent an "FYI" email with the Senate Resolution attached to Raimondo (their faculty advisor) and the then-president of the college, Marvin Krislov. That same evening, the student senate emailed the Senate Resolution to the entire student body. The student senate also posted the Senate Resolution in its glass display case in the student center in Wilder Hall, where it remained posted for almost one year.

{¶13} Because of the incident at the bakery, and in a claimed effort to appease the angry students, Raimondo testified that she instructed a subordinate to contact the college's supplier of food for its dining halls, Bon Appetit, and tell them to stop or halt supplying the college with food from the bakery. The parties dispute how long the bakery lost business from Raimondo's actions that interfered with the food order. They further dispute how much the bakery and the Gibsons' other businesses were negatively affected by publicity surrounding the flyer and the Senate Resolution. The Gibsons also owned two apartment buildings that provided off-campus housing for Oberlin students and others in the community, which the Gibsons alleged were also hurt by the actions of Oberlin.

{¶14} Oberlin and the Gibsons met a few times, but they sharply dispute what transpired during their attempts to resolve their differences and avoid litigation. For example, the Gibsons presented testimony that Oberlin initially had agreed to direct Bon Appetit to resume the dining hall orders, but only if the Gibsons dropped charges against the three students and/or gave students special treatment if they were caught shoplifting at the bakery, but the Gibsons would not agree to those conditions. Oberlin's witnesses denied even mentioning how it thought the Gibsons should handle incidents of shoplifting at the bakery. The Gibsons also asked Oberlin to reach out to its students to explain that the Gibsons had been falsely accused of a history of racial profiling and of assaulting the student. Oberlin's witnesses did not dispute that the Gibsons made that request or that it declined to comply with the Gibsons' request because it did not want to further anger its students.

{¶15} The Gibsons also presented evidence that members of Oberlin's senior administrative staff had communicated via several text and email messages to express their anger about the Gibsons pressing charges against the three Oberlin students and their feelings that the college should not work with the Gibsons to resolve this situation. For example, the interim assistant dean was present in court in August 2017 when the Oberlin students were convicted for their role in the November 2016 bakery incident. From the courthouse, she sent a text message to Raimondo, stating that "[t]his is the most egregious process" and that "I hope we rain fire and brimstone on that store." Raimondo responded by thanking the assistant dean for going to court to be with the students. Another example was a text message sent by Raimondo after the student newspaper published a letter from a retired Oberlin professor, which expressed criticism of the college's "handling of the Gibson matter." Raimondo sent a text message to another administrator

that stated, "F-him. I'd say unleash the students if I wasn't convinced this needs to be put behind us."

{¶16} During the next several months, the Gibsons believed that they lost business and became the targets of what they perceived to be ongoing harassment by Oberlin and its students. They blamed Oberlin for repeated vandalism and property damage and for Grandpa Gibson breaking his back while investigating the source of someone pounding on his apartment door in the middle of the night. According to the Gibsons, they had suffered significant financial and emotional damages caused by the actions of Oberlin.

{¶17} The Gibsons filed this action, which ultimately proceeded to a jury trial. The jury entered verdicts for the Gibsons (individually and/or the business) on their claims for libel, intentional infliction of emotional distress, and on their claim against Raimondo for intentional interference with business relationship. The jury also awarded attorney fees and compensatory and punitive damages, which were later capped by the trial court.

{¶18} Oberlin appeals, raising three assignments of error. The Gibsons cross-appeal, raising one cross-assignment of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN DENYING MOTIONS FOR SUMMARY JUDGMENT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT FILED BY [OBERLIN].

{¶19} Oberlin's first assignment of error does not challenge the jury's verdict as being against the weight of the evidence, nor does it directly challenge the admission of any evidence at trial. Instead, this assignment of error is confined to the trial court's denial of Oberlin's motions

for summary judgment and/or judgment notwithstanding the verdict (JNOV), based on reasons articulated in one or both of those motions and reiterated now on appeal.

{¶20} The Ohio Supreme Court has held that any error by the trial court in denying a motion for summary judgment based on disputed facts is harmless if a later trial on the merits involving the same factual issues demonstrates that there were disputed material facts, which result in a judgment in favor of the nonmoving party. *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 156 (1994). Any error in the denial of summary judgment became irrelevant after a jury decided the factual disputes, based on a full presentation of the relevant evidence. *Id*. at 157-158. Therefore, the trial court's denial of Oberlin's motion for summary judgment on grounds based on disputed facts is not a point of consideration in this appeal. *Amore v. Ohio Turnpike Comm.*, 194 Ohio App.3d 182, 2011-Ohio-1903 (9th Dist.), ¶ 33.

{¶21} *Whittington* also emphasized, however, that its decision was limited to a motion for summary judgment denied upon a finding that there were genuine issues of material fact, not on purely legal questions that were conclusively decided by the trial judge prior to trial. *Id*. at 159. This Court continues to have authority to review the denial of Oberlin's motion for summary judgment on purely legal questions that were never presented to the jury for its consideration, such as whether the speech at issue in this case was constitutionally protected. Because Oberlin reiterated those legal questions in its motion for JNOV, however, this Court will confine its review to the arguments raised through its motion for JNOV. "JNOV is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the nonmoving party reasonable minds could come to but one conclusion, that being in favor of the moving party." (Internal citations omitted.) *State v. The Jacts Group, LLC*, 9th Dist. Medina No. 19CA0044-M, 2020-Ohio-1173, ¶ 29. As a motion for JNOV is decided as a matter of law, this

Court will address these arguments de novo. *Williams v. Spitzer Auto World Amherst, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9.

{¶22} Through its lengthy motion for JNOV, Oberlin raised several arguments about why the Gibsons' claims should fail as a matter of law and argued that the matter should not have proceeded to a separate hearing on punitive damages. This Court will individually address the arguments that Oberlin has properly raised through this assigned error but will not reach the merits of arguments that Oberlin did not properly raise through its motion for JNOV or legal arguments that it did not raise on summary judgment, as Oberlin cannot fault the trial court for failing to grant their motions on grounds not asserted in those motions or forfeited during trial. *See In re F.B.*, 9th Dist. Summit Nos. 28960, 28985, 2019-Ohio-1738, ¶ 27; *Lehmier v. W. Res. Chem. Corp.*, 9th Dist. Summit No. 28776, 2018-Ohio-3351, ¶ 48; Civ.R. 51(A).

**A. Libel**

{¶23} "To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." (Internal citation omitted.) *Am. Chem. Soc. v. Leadscope, Inc*., 133 Ohio St.3d 366, 2012-Ohio-4193, ¶ 77. Through their motion for JNOV, Oberlin challenged several aspects of the Gibsons' libel claims and many of those challenges have been raised again on appeal. Oberlin asserts that the Gibsons' libel claims failed on the first, third, and fifth elements listed above because: the alleged libelous statements were

constitutionally protected opinion; Oberlin did not publish the statements; and Oberlin did not act with the requisite degree of fault.[2]

### 1. Factual Statements or Constitutionally Protected Opinion

**{¶24}** Oberlin attempted to defend against the libel claims by asserting that its students had a right to free speech and that their protests and written statements were protected by the First Amendment. It was for the trial court to decide as a matter of law whether the statements alleged to be defamatory were constitutionally protected speech or actionable as statements of fact. *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 6 Ohio St.3d 369, 372 (1983), abrogated on other grounds in *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451.

**{¶25}** Oberlin has asserted throughout this case, as have several organizations through amicus briefs on appeal, that any liability for defamation in this case could have a chilling effect on students' rights to free speech at colleges and universities across the country. This Court must emphasize, however, that Oberlin was granted summary judgment on the Gibsons' claims based on the verbal protests by Oberlin students. The trial court agreed that the student chants and verbal protests about the Gibsons being racists were protected by the First Amendment and, therefore, were not actionable in this case. By the time of trial, the Gibsons' libel claim focused solely on whether Oberlin had disseminated false, written statements of fact that caused the Gibsons significant harm.

**{¶26}** After the trial court granted partial summary judgment to Oberlin, the only potentially defamatory statements at issue in this case were those contained in two documents:

---

[2] Although Oberlin argues on appeal that the Gibsons failed to prove an actual injury caused by the publication of the libelous statements, this Court will not address that argument because it was not raised in the motion for JNOV.

(1) the flyer distributed during the protests and (2) the Senate Resolution, which was emailed to all members of the student body and posted in a display case in the student center.

{¶27} "'In determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances * * * to determine whether a [reasonable] reader would interpret [it] as defamatory." *Am. Chem. Soc.,* 133 Ohio St.3d 366, 2012-Ohio-4193, at ¶ 79, quoting *Mann v. Cincinnati Enquirer*, 1st Dist. Hamilton No. C-09074, 2010-Ohio-3963, ¶ 12. The words should be considered within the context of the entire publication and the thoughts that the publication is "calculated to convey to the reader to whom it is addressed." *Am. Chem. Soc*. at ¶ 79, quoting *Connaughton v. Harte Hanks Communications, Inc*., 842 F.2d 825, 840 (6th Cir.1988). To determine whether an alleged defamatory statement is fact or opinion, we examine four factors: the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared. *Scott v. News-Herald*, 25 Ohio St.3d 243, 250 (1986).

Flyer

{¶28} The flyer was a two-sided page. The front page of the flyer began with a large font, bold-faced "DON'T BUY" printed inside a template of an eight-point star, and included other pleas that people boycott the bakery and shop elsewhere. The back page of the flyer listed other local retailers for the students to find specific items.

{¶29} The libel claims focused on the following language on the front page of the flyer:

> This is a RACIST establishment with a LONG ACCOUNT of RACIAL PROFILING and DISCRIMINATION. Today we urge you to shop elsewhere in light of a particularly heinous event involving the owners of this establishment and local law enforcement.

PLEASE STAND WITH US

A member of our community was assaulted by the owner of this establishment yesterday. A nineteen y/o young man was apprehended and choked by Allyn Gibson of Gibson's Food Mart & Bakery. The young man, who was accompanied by 2 friends was choked until the 2 forced Allyn to let go. After [t]he young man was free, Allyn chased him across College St. and into Tappan Square. There, Allyn tackled him and restrained him again until Oberlin police arrived. The 3 were racially profiled on the scene. They were arrested without being questioned, asked their names, or read their rights. 2 were released shortly after and charged with assault. The young man is being held in Lorain County Jail, charged with robbery. No bail until his arraignment this Friday 8:30 AM, 65 S Main.

If you have been victimized by this establishment in any capacity, we ask you to stand with us in support of our community member.

(Emphasis in original.) The remainder of the first page provided an email address for people to supply additional information or photographs of the incident at the bakery.

### Senate Resolution

{¶30} The Senate Resolution was passed by the student senate on November 10, 2016. It urged students to cease all support of the bakery, and called upon the faculty and administration of the college to "condemn * * * the treatment of students of color by Gibson's Food Market and Bakery[.]" Rather than quoting the resolution in its entirety, this Court will summarize and quote the most relevant portions at issue here. The resolution begins by acknowledging and condemning hatred and bigotry as well as all acts of violence. It then details "a few key facts" about the Gibsons' incident because "we find it important to share" them with the Oberlin Community:

A Black student was chased and assaulted at Gibson's after being accused of stealing. Several other students, attempting to prevent the assaulted student from receiving further injury, were arrested and held by the Oberlin Police Department. In the midst of all this, Gibson's employees were never detained and were given preferential treatment by police officers.

Gibson's has a history of racial profiling and discriminatory treatment of students and residents alike. * * * .

{¶31} Oberlin has argued that the flyer and Senate Resolution contained only opinions, but it has focused its arguments throughout this case on statements alleging merely that the Gibsons

were racists. Despite Oberlin's arguments to the contrary, the potentially libelous statements in this case include much more than calling the Gibsons "racists."

{¶32} The trial court determined, as a matter of law, that both the flyer and the Senate Resolution were not statements of constitutionally protected opinion but were defamatory per se. The trial court focused on the statements about the Gibsons and their bakery having a history of racial profiling and discrimination toward students and residents and the statements about an "assault[]" of a student by an owner or owners of the bakery.

{¶33} The flyer states that the bakery has a "long account of racial profiling and discrimination" and the Senate Resolution states among its "key facts" that "Gibson's has a history of racial profiling and discriminatory treatments of students and residents alike." (Emphasis omitted.) Statements that the bakery has a "history" or "account" of discrimination and racial profiling would be interpreted by a reasonable reader to mean that there were past incidents of discrimination or profiling. These statements can be verified as true or false by determining whether there is, in fact, a history or account of racial profiling or discriminatory events at the bakery.

{¶34} The statements about an "assault[]" of a community member based on racial profiling at the bakery was described as "heinous" in the flyer and described in both the flyer and Senate Resolution to be unjustified under the circumstances. The trial court found that allegations of an assault, if untrue, were defamatory per se and Oberlin has not raised a timely or proper challenge to that ruling by the trial court.[3]

---

[3] Although Oberlin challenges this ruling on appeal, this issue was not raised in its motions for summary judgment or JNOV.

14

**{¶35}** Oberlin also argues that the statement in the flyer about a student being apprehended by "Allyn Gibson" was referring to young Allyn, who is not a party to this litigation, so there was no potential libel against any party. The flyer did not identify Allyn by his middle initial, however. Also, the sentence immediately preceding the first reference to Allyn in the flyer states that the young man was assaulted "by the owner of this establishment[.]" Moreover, the first paragraph of the flyer referred to "a particularly heinous event involving the owners of this establishment[.]" A reasonable reader would interpret this language to state that the owners of the bakery assaulted the young man.

**{¶36}** The trial court's conclusion that these statements were actionable factual statements was further supported by reading them within the context of the flyer and Senate Resolution and the broader context of the environment at the college, where students had been expressing ongoing dissatisfaction with racial injustice on campus and in the community at large. These statements were published shortly after the incident at Gibsons, prior to the prosecution and conviction of the students, and before the actual facts had been flushed out.

**{¶37}** Given the public's lack of knowledge of what had happened at the bakery and the ongoing tension on campus about racial injustice, these statements would convey to a reasonable reader that the arrest and alleged assault at the bakery were racially motivated, that the Gibsons had a verifiable history of racially profiling shoplifters on that basis for years, and that those facts were a reason to boycott the bakery. The trial court did not err in concluding, as a matter of law, that these were actionable statements of fact, not constitutionally protected opinion. Consequently, it did not err in denying Oberlin's motion for JNOV on this basis.

2. Publication of Statements

**{¶38}** Next, Oberlin asserts that the Gibsons did not prove that Oberlin published either the flyer or the Senate Resolution. Much of Oberlin's argument about whether the Gibsons proved publication is intertwined with an argument about the degree of fault that the Gibsons were required to prove. Although fault must be proven at the time of publication, publication is a distinct element of the libel claim. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, ¶ 77. This Court will focus its publication review on whether the trial court erred in denying JNOV on the publication element of the Gibsons' libel claims.

**{¶39}** "Any act by which [] defamatory matter is communicated to a third party constitutes publication." (Emphasis omitted.) *Hecht v. Levin*, 66 Ohio St.3d 458, 460 (1993), citing 3 Restatement of the Law 2d, Torts, Section 577(1), Comment a (1965). "As a general rule, all persons who cause or participate in the publication of libelous or slanderous matter are responsible for such publication * * *. Hence, one who requests, procures, or aids or abets, another to publish defamatory matter is liable as well as the publisher." (Internal quotations and citation omitted). *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. Franklin No. 02AP-781, 2003-Ohio-3118, ¶ 25.

**{¶40}** Construing the evidence before the trial court in favor of the Gibsons, as a motion for JNOV requires, reasonable minds could conclude that Oberlin published the flyer and the Senate Resolution. Therefore, JNOV on that basis would not have been proper. *See The Jacts Group, LLC*, 2020-Ohio-1173, at ¶ 29. We will review the evidence pertaining to the publication of each allegedly defamatory statement separately.

Flyer

**{¶41}** It is unknown from the record who wrote the flyer or made the initial copies of it. Nevertheless, it is not disputed that the flyers were distributed during the protests outside the bakery. Moreover, the Gibsons presented evidence that Raimondo handed at least one copy of the flyer to Jason Hawk, a reporter and editor with the Oberlin News-Tribune. Although Raimondo and other Oberlin witnesses disputed much of the evidence presented by the Gibsons on this issue, in our review of the denial of Oberlin's motion for JNOV, we must construe the evidence in favor of the Gibsons. *See id.*

**{¶42}** Jason Hawk testified for the Gibsons. According to him, Raimondo saw him watching the protest and trying to take pictures. She walked over to him and identified herself by name and her role at the college. He told Raimondo that he was a reporter with the Oberlin News-Tribune. She asked him if he already had a copy of the flyer and, because he did not, she asked a student to go get one for him. The student returned with a flyer, handed it to Raimondo, who then directly handed it to Hawk. Hawk later published more than one article in the Oberlin News-Tribune that quoted in part from the flyer.

**{¶43}** The former director of security at Oberlin testified that he attended the protests to see what was transpiring at the event. He was handed a flyer by a student but threw it away. He testified that another man, who identified himself as being with the college, later tried to hand him another flyer but he refused it. The former security director was later able to identify the man by his picture on the college's Facebook page as the associate director of Oberlin's multicultural resource center. Although no one else testified that this Oberlin employee had been handing out flyers, other witnesses did testify that he attended the protest.

**{¶44}** The former security director further testified that he saw the same man walking through the crowd with a stack of flyers. On cross-examination, Oberlin questioned whether he could read the flyers in the man's hands. The witness responded unequivocally that it was the same flyer because he could see the star emblem on top that read, "DON'T BUY[.]"

**{¶45}** An Oberlin College professor testified that she was monitoring the students during the protest when one of them asked if the students could place flyers on the windshields of parked cars. She responded that they could place the flyers on car windshields but advised them not to go onto any private property.

**{¶46}** An employee of the bakery who was working during the protests testified that he observed Raimondo with a large stack of flyers and saw her handing smaller stacks of them to students to distribute. He testified that he also overheard Raimondo tell students that they could make more copies of the flyer in the conservatory office.

**{¶47}** An Oberlin employee who worked in the conservatory office that day testified that, during the protests, students brought her a flyer to make copies. She explained that she handed the flyer to a superior, who offered to make copies and walked toward the copy room. Although she never saw her superior with copies of the flyer, he never told her that he did not copy the flyer. She testified that she believed that he had made copies of the flyer for the students.

**{¶48}** Finally, the jury heard evidence about other actions taken by the Oberlin faculty and administration to aid the students. The college provided a room in a nearby building for them to take breaks during the protests, the college supplied coffee and pizzas in that room, and Raimondo agreed to reimburse a student for $75-100 that she spent on gloves so the protestors would not get too cold.

{¶49} Construing the totality of this evidence in favor of the Gibsons, a reasonable person could conclude that Oberlin took actions to directly publish and/or assist in publishing the flyer. Therefore, the trial court properly denied JNOV as to the publication of the flyer.

Senate Resolution

{¶50} Although the jury heard less evidence about the active role that Oberlin played in the publication of the Senate Resolution, there is an important distinction between the Senate Resolution and the flyer. Unlike the flyer, the Senate Resolution was not distributed on the street by an unknown group of students to people who happened to walk by. The Senate Resolution was written and published by an organization that was sanctioned by the college to govern its student body. The jury heard evidence that Oberlin assisted the student senate in its activities by providing it with financial support; a faculty advisor, Raimondo; an office in the student center; and a nearby glass display case within which it could post announcements.

{¶51} More significantly, the college also provided the student senate with the authority to meet and pass resolutions, distribute them to the entire student body via a mass email, and display their resolutions in the glass display case in the student center. Also, the evidence at trial was undisputed that the evening that the student senate passed the resolution, the senate sent a copy of the resolution to Raimondo, its advisor, and then-president Krislov. Raimondo and Krislov did not respond about the content of the resolution, and both claimed that they were unaware that it was posted in the student center, for nearly one year, in the same building in which Raimondo had her office.

{¶52} This evidence about Oberlin affirmatively providing the student senate with various types of outward assistance could support a jury conclusion that Oberlin facilitated the initial publication of the Senate Resolution. But for Oberlin providing the student senate with the means

and authority to create and send the Senate Resolution to the entire student body via email and post it in a prominent display case in the student union to be seen by current and potential students, the Senate Resolution could not have been published in the manner it was in this case. *See Cooke*, 2003-Ohio-3118, at ¶ 25 (affirmative acts of aiding and abetting are sufficient to establish publication).

**{¶53}** The Gibsons also argued throughout the trial that Raimondo or the college should have stopped the publication of the Senate Resolution by removing the resolution from the display case, sending a message to the student body, and/or otherwise calling upon the student senate to retract and/or correct their defamatory statements. Oberlin responded throughout these proceedings that it had no obligation to remove the resolution from the display case or to take corrective actions regarding it.

**{¶54}** Oberlin cited no legal authority to support that argument, however, nor did it present evidence at trial that it lacked the ability to take corrective actions. On the other hand, there is authority to support the Gibsons' position on this issue. In addressing similar issues, the Tenth District determined that a defendant could be held liable for not removing defamatory signs posted on her property. In wrestling with the issue, the court held that "[o]ne who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." *Dillon v. Waller*, 10th Dist. Franklin No. 95APE05-622, 1995 WL 765224, *7 (Dec. 26, 1995), quoting and later adopting 3 Restatement of the Law 2d, Torts, Section 577, at 201 (1977). We agree with this reasoning.

**{¶55}** In reviewing the evidence in line with Section 577 and the reasoning of the Tenth District, there was evidence before the jury, construed in favor of the Gibsons, that supported a

conclusion that Oberlin knew that the Senate Resolution was posted in the display case in the student center for nearly one year, yet it failed to take action to remove it. The evidence was not disputed that the Senate Resolution was enacted on November 10, 2016, a copy was sent to Raimondo and the college's then-president that same evening, and the resolution was posted in the display case near the student senate office in the student center until after the Gibsons filed their lawsuit on November 7, 2017. Oberlin presented the testimony of Raimondo and others that no one in a position of authority at the college knew that the resolution was posted in the display case until after the lawsuit was filed, because the complaint referred to the posting in the display case.

{¶56} The Gibsons presented evidence, however, to question the credibility of Oberlin's witnesses about their lack of knowledge about the Senate Resolution being posted in the display case. The student senate emailed an "FYI" copy of the Senate Resolution to Raimondo and the college's then-president Krislov. Both testified that they were aware that the glass display case was where the student senate posted announcements. Moreover, Raimondo's office was one floor up in the same building and she was the faculty advisor of the student senate, whose office was near the display case. Evidence was also admitted that the display case could be easily seen by students, prospective students and their parents, and other visitors to the student center. A reasonable juror could conclude that Raimondo and/or the former president knew that the Senate Resolution was posted in the display case.

{¶57} Shortly after the Gibsons filed this lawsuit, Raimondo asked members of the student senate to remove the resolution from the display case, which they did. A reasonable juror could also infer from that evidence that Raimondo, as the faculty advisor, had the authority and/or obligation to instruct the student senate to remove the resolution many months earlier. Therefore,

construing the evidence presented at trial in favor of the Gibsons, the trial court did not err in failing to grant Oberlin JNOV based on the publication of the Senate Resolution.

### 3. Degree of Fault Required

{¶58} On appeal, Oberlin argues the trial court incorrectly found as a matter of law that the Gibsons were not public figures or limited-purpose public figures and should have granted their JNOV motion on this basis. The status of the plaintiffs determines the degree of fault required to prevail on their claims for libel. Because the trial court found that the Gibsons were private figures, they were required to prove that Oberlin acted negligently in publishing the resolution and flyer. *See Gilbert v. WNIR 100 FM*, 142 Ohio App.3d 725, 736, 742 (9th Dist.2001). Had the trial court accepted Oberlin's argument that the Gibsons were public figures, they would have been required to prove malice to support their libel claims. *Id*. at 735.

{¶59} One may be designated a public figure for all purposes by achieving "pervasive fame or notoriety." *Id.* at 736. As this Court further explained in *Gilbert*, "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 737, quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). This Court rejected the argument that attorney Gilbert was a public figure simply because he was a "well-known attorney in the Akron legal community." *Gilbert* at 737. Similarly, we cannot conclude that the Gibsons became public figures merely because they ran a well-known business in the small community of Oberlin, Ohio.

{¶60} A person may also become a public figure for certain purposes when he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (Citation omitted.) *Id*. at 736. Oberlin argues that the Gibsons had

become limited purpose public figures because they voluntarily injected themselves into the controversy at issue in this case.

{¶61} Oberlin broadly defines the controversy in this case to be what it alleges is a history of racism at the bakery. The proper focus of this inquiry, however, is on the controversy from which the alleged defamation arose: the incident at the bakery on November 9, 2016. *See Woods v. Capital Univ.*, 10th Dist. Franklin No. 09AP-166, 2009-Ohio-5672, ¶ 36. The Gibsons did not voluntarily inject themselves into a shoplifting incident at their bakery, nor did they voluntarily inject themselves into extreme public criticism of their employee's efforts to apprehend and detain the shoplifter. Oberlin has failed to demonstrate that the trial court erred in concluding, as a matter of law, that the Gibsons were private figures.

{¶62} Because the Gibsons were private figures in this libel case, they were required to prove only that Oberlin acted with negligence, not actual malice. Oberlin has not argued through this assignment of error that the Gibsons failed to prove negligence, so we need not review the propriety of that finding. Therefore, as Oberlin has failed to demonstrate merit in any of its arguments, the trial court did not err in overruling Oberlin's motion for JNOV on the Gibsons' libel claims.

## 2. Interference with Business Relationship

{¶63} After the jury trial, judgment was granted on behalf of Oberlin but against Raimondo on the Gibsons' claims for intentional interference with business relationship. Oberlin argued in its motion for JNOV that, based on the evidence presented at trial, Raimondo also should have been granted judgment on this claim. "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with

another, or not to perform a contract with another." *A & B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 14 (1995). The interference must be "by someone who is not a party or agent of the party to the contract or relationship at issue." *Dorricott v. Fairhill Ctr. for Aging,* 2 F.Supp.2d 982, 989-990 (N.D.Ohio 1998), citing *Miller v. Wikel Mfg. Co., Inc.,* 46 Ohio St.3d 76, 79 (1989).

**{¶64}** Oberlin argued that the Gibsons had no cognizable claim against Raimondo for tortious interference with the business relationship between Bon Appetit and the bakery because Bon Appetit was not a third party but was an agent of the college. Thus, Raimondo, as an employee of the college, could not tortiously interfere in a business relationship with another agent of the college because she was essentially a party to that relationship. Consequently, the sole dispute is whether Bon Appetit conducted business with the Gibsons as an independent third party or as an agent of Oberlin.

**{¶65}** "Agency has been defined as a consensual fiduciary relationship between two persons where the agent has the power to bind the principal by his actions, and the principal has the right to control the actions of the agent." (Internal quotations and citations omitted.) *Cincinnati Golf Mgt., Inc. v. Testa*, 132 Ohio St.3d 299, 2012-Ohio-2846, ¶ 20. The parties both argue that the authoritative case law involves whether Bon Appetit had authority to bind Oberlin to the business relationship that it had with the bakery. *See*, *e.g.*, *id.*; *Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 155 Ohio St.3d 276, 2018-Ohio-4488.

**{¶66}** Therefore, this Court confines its review to the argument briefed by the parties: whether Bon Appetit, the alleged agent, had authority to bind Oberlin, the alleged principal. *Cincinnati Golf Mgt., Inc.* at ¶ 20; *Willoughby Hills Dev. & Distrib., Inc.* at ¶ 27-28. "[B]inding the principal to agent-made contracts typically requires that the agent make the contracts on the

principal's behalf with actual authority to do so. The Restatement defines 'actual authority' in terms of an expression of intent by the principal that the agent act on behalf of the principal, along with the understanding of the agent." (Emphasis and citations omitted.) *Cincinnati Golf Mgt., Inc.* at ¶ 24.

{¶67} To determine whether a principal-agent relationship existed, the court should review the management agreement to determine whether the way in which it defined the relationship between the two parties was consistent with imputing purchase-agent status to the alleged agent. *Cincinnati Golf Mgt., Inc.*, 132 Ohio St.3d 299, 2012-Ohio-2846, at ¶ 26. "A purchaser is not 'acting on behalf of' a supplier in a distribution relationship in which goods are purchased from the supplier for resale. A purchaser who resells goods supplied by another is acting as a principal, not an agent." *Willoughby Hills Dev. & Distrib.*, 155 Ohio St.3d 276, 2018-Ohio-4488, at ¶ 30, quoting 1 Restatement of the Law 3d, Agency, Section 1.01, at 30 (2006).

{¶68} Oberlin and Bon Appetit had entered into a management agreement years earlier. Among other things, the agreement provides that "Bon Appetit shall act as agent for Oberlin in the management of Food Service Operation[.]" The parties do not dispute that this one statement referring to Bon Appetit as Oberlin's agent is not determinative of the agency issue. *See N & G Constr., Inc. v. Lindley*, 56 Ohio St.2d 415, 417 (1978), fn. 1.

{¶69} The Gibsons also pointed to a sentence in that same "Agency Relationship" paragraph, which provides that "Bon Appetit shall purchase food and supplies in Bon Appetit's name and shall pay the invoices." This language indicates that Bon Appetit simply purchased goods from the bakery and resold them to Oberlin, acting as a principal, not an agent. *See Willoughby Hills Dev.*, 155 Ohio St.3d 276, 2018-Ohio-4488, at ¶ 30. Nothing in the remainder of the 11-page management agreement indicates that Bon Appetit had any authority to bind

Oberlin to its business relationship with the bakery or any of its vendors. Consequently, Raimondo failed to prove that Bon Appetit acted as a purchasing agent for Oberlin, so she has failed to demonstrate that trial court erred in denying her motion for JNOV on this claim.

### 3. Intentional Infliction of Emotional Distress

**{¶70}** The Gibsons' final claim involves intentional infliction of emotional distress. To establish their claims for intentional infliction of emotional distress, David and Grandpa Gibson were required to prove that: the defendants intended to cause, or knew or should have known, that their actions would result in serious emotional distress; their conduct was extreme and outrageous, going beyond all bounds of decency and considered intolerable in a civilized society; their actions proximately caused psychic injury to the plaintiffs; and the plaintiffs suffered mental anguish beyond what a reasonable person would be expected to endure. *Shetterly v. WHR Health Sys.*, 9th Dist. Medina No. 08CA0026-M, 2009-Ohio-673, ¶ 15.

**{¶71}** Oberlin has argued that the claims of David and Grandpa Gibson for intentional infliction of emotional distress were legally insufficient because the claims relied on the same constitutionally protected speech that formed the basis of their libel claims and that the allegedly libelous statements did not rise to the level of extreme and outrageous conduct. This Court has already determined in this assignment of error, however, that that the statements that formed the basis of the Gibsons' libel claims were not constitutionally protected speech.

**{¶72}** Moreover, the conduct at issue in the Gibsons' claims for intentional infliction of emotional distress included much more than the statements in the flyer and the Senate Resolution. The Gibsons presented evidence that, despite the bakery's ongoing business relationship with Bon Appetit, Oberlin abruptly told Bon Appetit to stop doing business with the bakery. In meetings between the Gibsons and administration, Oberlin expressed a greater concern about appeasing its

students than with repairing the Gibsons' ongoing business relationship with Bon Appetit. According to the Gibsons, Oberlin would not direct Bon Appetit to resume business with the bakery unless the Gibsons agreed to drop criminal charges against the student shoplifters and/or implement a policy through which they would not prosecute any first-time student shoplifters but would instead give them a "pass" and contact the college instead of the police.

{¶73} The Gibsons presented several printed text and email messages between senior college administrators to demonstrate that, nearly a year after the bakery incident, they did not believe that the college should work with the Gibsons to resolve this situation. Oberlin's witnesses did not dispute that the printed messages had been communicated between the administrators. One text message sent by the interim assistant dean expressed that the criminal conviction of the three students was "an egregious process" and that she hoped the college would "rain fire and brimstone" on the bakery. In response to a published letter from a retired Oberlin professor who criticized Oberlin's response to the college's situation with the Gibsons, Raimondo stated in another text message, "F-him. I'd say unleash the students if I wasn't convinced this needs to be put behind us." The Gibsons presented other messages that were communicated between senior administrators that also expressed their lack of concern about the past and ongoing damages that had been suffered by the Gibsons.

{¶74} The Gibsons also presented evidence that, after Oberlin administrators had learned that the student allegations of assault and racial profiling might be false, they directed Bon Appetit to resume business with the bakery. Oberlin denied the requests of the Gibsons, however, to correct the statements in the flyer or Senate Resolution or to otherwise work with the students or community to help restore, or stop the ongoing damage to, the Gibsons' reputations. Although

Oberlin disputed much of this evidence, the trial court was required to construe the evidence in favor of the Gibsons.

{¶75} Also, through this argument, Oberlin has challenged only the adequacy of the outrageous conduct alleged by the Gibsons, not whether they proved that Oberlin was responsible for it. The Gibsons also presented evidence that they had been continually taunted and harassed for many months, that their business and property had been vandalized, and that Grandpa Gibson had broken his back after an encounter with someone he believed was trying to harass him or break into his apartment.

{¶76} Construing this evidence in favor of the Gibsons, this Court cannot conclude that reasonable minds could only conclude that this conduct failed to rise to the level of extreme and outrageous. Therefore, the trial court did not err in denying JNOV on this basis.

### 4. Punitive Damages

{¶77} Finally, Oberlin argues that the trial court erred in denying its motion for JNOV in that it should not have been allowed to consider an award of punitive damages in the bifurcated damage stage of the trial. Oberlin alleges that because the jury had already found no actual malice in the liability stage of the trial it was improper to further consider punitive damages on the libel claim. Oberlin cites no authority in support of its argument on appeal.

{¶78} R.C. 2315.21(B)(1) provides:

In a tort action that is tried to a jury and in which a plaintiff makes a claim for compensatory damages and a claim for punitive or exemplary damages, *upon the motion of any party*, the trial of the tort action shall be bifurcated as follows:

(a) *The initial stage of the trial shall relate only to* the presentation of evidence, and a determination by the jury, with respect to *whether the plaintiff is entitled to recover compensatory damages* for the injury or loss to person or property from the defendant. During this stage, no party to the tort action shall present, and *the court shall not permit a party to present, evidence that relates solely to the issue of*

*whether the plaintiff is entitled to recover punitive or exemplary damages* for the injury or loss to person or property from the defendant.

(b) *If the jury determines* in the initial stage of the trial that the *plaintiff is entitled to recover compensatory damages* for the injury or loss to person or property from the defendant, *evidence may be presented in the second stage* of the trial, and a determination by that jury shall be made, *with respect to whether the plaintiff additionally is entitled to recover punitive or exemplary damages* for the injury or loss to person or property from the defendant.

(Emphasis added.)

**{¶79}** Oberlin moved the trial court, pursuant to this provision, to bifurcate the trial into stages on the issues of compensatory and punitive damages. Because Oberlin requested bifurcation under R.C. 2315.21(B), and the statute was otherwise satisfied, bifurcation was mandatory. *Havel v. Villa St. Joseph*, 131 Ohio St.3d 235, 2012-Ohio-552, ¶ 25.

**{¶80}** As noted already, this case proceeded to the jury upon a legal finding by the trial court that the actionable statements in the flyer and Senate Resolution, if false, constituted libel per se. At common law, malice was presumed in cases of defamation per se, so a plaintiff did not have the burden to plead or prove damages. *Woods*, 2009-Ohio-5672, at ¶ 33. Decisions of the United States Supreme Court, including *Gertz*, 418 U.S. at 349, later held that states could no longer award presumed damages to a private defamation plaintiff in a matter of public concern without a showing that the defendant published the statement with knowledge or reckless disregard of its truth. *Id*. "Thus, in Ohio, [] plaintiff[s] must prove either: (1) ordinary negligence and actual injury, in which case [they] can receive damages for the actual harm inflicted; or (2) actual malice, in which case [they are] entitled to presumed damages." *Woods* at ¶ 35.

**{¶81}** The parties agreed at the commencement of the liability phase that malice was an element of the Gibsons' libel claims, insofar as it pertained to a presumption of damages on those claims, but nothing else. During the liability phase of the trial, without objection from any of the

parties, the jury was asked to determine whether Oberlin acted with malice in publishing the libelous statements. The jury interrogatories also asked the jury to determine if each plaintiff proved by clear and convincing evidence whether each defendant acted with malice and/or negligence on each libel claim.

**{¶82}** Oberlin argues only that the malice issue had already been decided during the liability phase, so malice should not have been relitigated during the punitive damages phase. The parties agreed from the beginning of the trial that malice was an element of the Gibsons' libel claims and pertained directly to their request for compensatory damages. The evidence and jury findings were limited to whether Oberlin published the flyer and Senate Resolution with knowledge or reckless disregard to the truth or falsity of the claims.

**{¶83}** In enacting the tort reform provisions under R.C. 2315.21(B)(1), the legislature granted either party the right to request that the trial of the liability portion of the tort claim be bifurcated or separated from any punitive damage stage. As such, if a party requests bifurcation and a jury finds compensatory damages in the liability stage, the court must hold a second stage of the trial to determine punitive damages since evidence of punitive damages cannot be presented in the liability stage. The benefits to a defendant are obvious because in an ordinary tort case, the jury is not potentially influenced in its liability determination by evidence of common law malice, e.g., hatred or ill will.

**{¶84}** Unfortunately, a defamation case does not fit nicely into this statutory framework. In fact, the Ohio Supreme Court only recently determined that noneconomic defamation damages are covered by R.C. 2315.21(B)(2) as a personal injury tort. *See Wayt v. DHSC, L.L.C.*, 155 Ohio St. 3d 401, 2018-Ohio-4822. As mentioned previously, the actual malice that needs to be proven in a defamation case is not the common law malice in a usual tort claim. Instead, the actual malice

that must be proven for punitive damages in defamation relates to whether the defendant published the statement with knowledge or reckless disregard of its truth, i.e., constitutional malice.

**{¶85}** It gets even more convoluted in relation to whether the plaintiff is a private figure or a public figure and whether or not it is a matter of public concern or private concern. Here the trial court ruled that the Gibsons were private figures in a matter of public concern, so they only had to prove negligence and not actual malice. However, with a finding of negligence alone the Gibsons had to prove actual damages in order to recover compensatory damages. The other avenue was to prove actual malice or that Oberlin published the statements with knowledge or reckless disregard of its truth and recover presumed damages.

**{¶86}** R.C. 2315.21(B)(1)(b) provides that punitive damages can only be given after an award of compensatory damages. The Gibsons could have received compensatory damages at trial in one of two ways, upon proof of actual damages or with presumed damages upon a finding of actual malice. The jury found Oberlin negligent and awarded actual damages to the Gibsons. After the jury's award of compensatory damages in the first stage of the trial, R.C. 2315.23(B)(1) provides that the jury shall then determine at a second stage, after the presentation of evidence, whether punitive damages shall be awarded as well.

**{¶87}** On the other hand, if Oberlin had not requested bifurcation, the Gibsons could have put on their entire case at the liability stage of the trial with evidence presented of both compensatory and punitive damages. Without Oberlin's request for bifurcation, the jury would not have had to look at actual malice for liability and then again for punitive damages.

**{¶88}** Because Oberlin did request bifurcation, however, after compensatory damages were awarded by the jury, the Gibsons were entitled to proceed to the second stage of trial and put on any evidence they had pertaining to punitive damages for each of their claims: defamation,

intentional infliction of emotional distress, and tortious interference with business relationship. The Gibsons cannot be punished for Oberlin's choice to bifurcate.

{¶89} For all the reasons stated above, Oberlin's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING OBERLIN'S MOTION FOR A NEW TRIAL OR REMITTITUR AND BY FAILING TO CAP DAMAGES AS REQUESTED.

{¶90} Oberlin's second assignment of error is that the trial court erred in denying its motion for a new trial or remittitur based on certain arguments raised in that motion, including that the trial court gave incorrect jury instructions on the libel claims; it erred in excluding certain evidence; and that it should have reduced the compensatory damage award. This Court will address each argument in turn.

### A. Jury Instructions

{¶91} Through its motion for a new trial and again on appeal, Oberlin challenges the trial court's instructions to the jury pertaining to the degree of fault that the Gibsons were required to prove on their libel claims.

{¶92} Oberlin argues that the trial court erred in instructing the jury with an incorrect legal definition of the standard of negligence that applies in a defamation case. Although the trial court did correctly instruct the jury that it must find negligence by clear and convincing evidence, Oberlin argues that it did not correctly define "negligence" as it applies to the degree of fault required in the publication of an allegedly libelous statement. Specifically, the trial court instructed the jury as follows:

Negligence is the failure to use reasonable care. Every person is required to use *reasonable care to avoid causing injury* to others or their property.

Reasonable care is the care that a reasonably careful person would use under the same or similar circumstances.

(Emphasis added.)

**{¶93}** Oberlin argues that the above instruction was not the correct definition of negligence to use in a libel case because it focuses on the care that was used to avoid injury, not on the care used to discover the truth or falsity of the statements being published. *See Lansdowne v. Beacon Journal Publishing* Co., 32 Ohio St.3d 176, 180 (1987). The Gibsons argue that Oberlin did not preserve this issue for appellate review. *See Thornton v. Summit Cty. Bd. of Mental Retardation & Dev. Disabilities*, 9th Dist. Summit No. 19343, 2000 WL 112086, *8 (Jan. 26, 2000) (a party must comply with Civ.R. 51 to raise an objection to a jury instruction through a motion for new trial).

**{¶94}** Civ.R. 51(A) provides, in relevant part:

[A]ny party may file written requests that the court instruct the jury on the law as set forth in the requests. * * * The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. * * * .

On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, *stating specifically the matter objected to and the grounds of the objection*.

(Emphasis added.) "The Ohio Supreme Court has held that an appellant fully informs the court of its position when the appellant formally requests an instruction to the contrary and argued the issue to the trial court." *Callahan v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 22387, 2005-Ohio-5103, ¶ 9, citing *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 61 (1991). In other words, Oberlin could have preserved its objection to the negligence jury instruction by formally requesting an instruction to the contrary or by raising a timely objection to the instruction, if Oberlin also fully informed the trial court of the specific objection and the grounds for it.

{¶95} Oberlin did submit a different proposed jury instruction to the trial court:

> Negligence is a *failure to use ordinary care in ascertaining the truth or falsity* of the alleged libelous statements. Every person is required to use ordinary care to avoid injuring another person.

(Emphasis added.). Although Oberlin proposed the standard of negligence as set forth in *Lansdowne* and other Ohio Supreme Court cases, it failed to cite any legal authority to support the different instruction. When the trial court stated that it would give a different instruction, Oberlin objected on the record, but again cited no legal authority to support its argument that the trial court's negligence instruction was incorrect.

{¶96} Although Oberlin cited to *Lansdowne,* 32 Ohio St.3d at 180, in its motion for a new trial and again on appeal, it did not timely apprise the trial court of the specific grounds for its objection: that the trial court's negligence instruction did not comport with the legal standard set forth by the Ohio Supreme Court. Instead, in its written proposed jury instruction, Oberlin cited only to the *Ohio Jury Instructions,* CV Section 401.01(1) (Rev. May 12, 2012). The Ohio Jury Instructions apply the same definition of negligence to all torts, including defamation. *See Ohio Jury Instructions*, CV Section 431.03(11) (Rev. Sept. 13, 2003). The negligence standard set forth in Section 401.01(1) of the Ohio Jury Instructions provides:

> Negligence is a failure to use (reasonable) (ordinary) care. Every person is required to use (reasonable) (ordinary) care to avoid injuring (another person) (another's property).

{¶97} The Ohio Jury Instructions' definition of negligence is virtually identical to the negligence instruction given by the trial court in this case. Oberlin's citation to the Ohio Jury Instructions provided no support for its argument that a different negligence instruction was warranted in this case. Because Oberlin did not apprise the trial court of the specific grounds for its objection, Oberlin forfeited its right to raise this issue through a motion for a new trial or on

appeal to this Court. The appellants have not argued plain error and this Court will not make that argument for them. *See State v. Curtis*, 9th Dist. Medina No. 04CA0067-M, 2005-Ohio-2143, ¶ 15.

{¶98} Although Oberlin also argues that the jury should not have been instructed on aiding and abetting and that the jury should have been instructed on distributor liability, it likewise failed to preserve those issues for its motion for new trial because it did not comply with Civ.R.51(A) by stating its objection and the legal basis for these changes to the jury instructions. The appellants forfeited all but plain error regarding these two instructions, have not argued plain error, and this Court will not make a plain error argument for them. *See id*. Oberlin has failed to demonstrate that the trial court erred in denying its motion for new trial based on any of these jury instructions.

### B. Evidence Excluded

{¶99} Oberlin also argues that the trial court erred in denying its motion for new trial based on its exclusion of certain evidence: (1) specific details of what happened during the shoplifting incident, and (2) testimony about "what Oberlin heard from members of the community about experiences at the bakery that they believed to be racially discriminatory[.]" Oberlin asserts that the exclusion of this evidence was prejudicial because the Gibsons were permitted to present evidence on these issues that was unfavorable to Oberlin, but Oberlin was not permitted to defend against these claims by presenting contradictory evidence.

{¶100} "Depending upon the basis of a motion for a new trial, this Court reviews the trial court's decision to grant or deny the motion under either a de novo or an abuse of discretion standard of review." *Designers Choice, Inc. v. Attractive Floorings, LLC*, 9th Dist. Lorain No. 19CA011576, 2020-Ohio-4617, ¶ 10, quoting *Calame v. Treece*, 9th Dist. Wayne No. 07CA0073, 2008-Ohio-4997, ¶ 13, citing *Rohde v. Farmer*, 23 Ohio St.2d 82 (1970), paragraphs one and two

of the syllabus. "[If] the basis of the motion involves a question of law, the de novo standard of review applies, and when the basis of the motion involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies." *Designers Choice, Inc.*, 2020-Ohio-4617, at ¶ 10, quoting *Dragway 42, L.L.C. v. Kokosing Constr. Co., Inc.*, 9th Dist. Wayne No. 09CA0073, 2010-Ohio-4657, ¶ 32.

{¶101} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Therefore, Oberlin must demonstrate that the trial court abused its discretion in excluding this evidence. "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶102} Both parties had attempted to present more evidence about the shoplifting incident, but the trial judge would not allow it and repeatedly reminded counsel on both sides not to relitigate the criminal proceedings. Throughout this lengthy trial, the trial judge refused to allow the parties to present evidence about the shoplifting incident except that it happened, the students were arrested, the protests and alleged defamatory statements followed, and the three students were eventually convicted. Consequently, very few details about the shoplifting incident were admitted at trial, as is reflected in this Court's brief statement of facts about that incident. As Oberlin has failed to demonstrate that the exclusion of this evidence affected the parties differently or otherwise prejudiced its case, it has failed to demonstrate that the trial court acted unreasonably in excluding this evidence.

{¶103} Next, Oberlin argues that the Gibsons were permitted to present evidence that they were not perceived as racists, while Oberlin was prohibited from presenting contradictory

evidence. The Gibsons presented the testimony of numerous witnesses who knew them either as employees of the bakery, friends, or community members. Those witnesses testified about their own experiences with the Gibsons and the bakery and explained that they had never witnessed any incidents of racism or racial profiling.

{¶104} Oberlin, on the other hand, did not call witnesses to testify about their personal experiences with the Gibsons. Instead, the defendants sought to have Oberlin administrators testify about "what Oberlin heard" about the Gibsons from community members. Under Evid.R. 801(C), hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Oberlin does not argue that these statements were not hearsay or that they fell within an exemption or exception to the rule against admissibility set forth in Evid.R. 802. Oberlin's excluded evidence was hearsay, while the Gibsons' evidence on this issue was not. Oberlin has failed to demonstrate that the trial court abused its discretion by excluding its hearsay evidence about what Oberlin had heard about the Gibsons. Therefore, Oberlin has failed to demonstrate that the trial court erred in denying its motion for a new trial based on excluded evidence.

### C. Compensatory Damages

{¶105} This Court will next address Oberlin's argument that the trial court should have remitted the damages further. "[C]ourts have inherent authority to order remittiturs to reduce jury awards when they deem the amount to be excessive based on facts found by the jury." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 38. "This Court reviews a trial court's decision to deny remittitur for an abuse of discretion." *Jemson v. Falls Village Retirement Community, Ltd.*, 9th Dist. Summit No. 20845, 2002-Ohio-4155, ¶ 17.

{¶106} Oberlin argues that, even applying damages caps, the award is still exorbitant. It argues that there was no witness testimony as to any losses caused by the flyer or resolution. It also argues that any economic loss caused by the alleged hostile environment created by the protests was merely speculative, including the belief that the harm would continue for 30 years. The Gibsons argue that they presented sufficient evidence of their damages as well as the fact that it flowed from Oberlin's tortious conduct.

{¶107} The Gibsons called a certified public accountant with 35 years of experience to testify about the economic harm they suffered. He testified that he had a professional designation as a certified valuation analyst and that his experience and training enabled him to give a professional opinion on the economic losses proximately caused by Oberlin's actions. He divided the Gibsons' damages into three categories: lost profits for the bakery, lost rental income, and lost rental opportunities. For the lost profits to the bakery, he reviewed the Gibsons' tax returns, general ledger, and other financial statements. He also visited the site of the bakery, interviewed the Gibsons, and reviewed the Gibsons' depositions. He then applied professional guidelines to compute the Gibsons' lost profits. He explained that the reason he projected the losses out 30 years is that the bakery dates to 1885, which puts it in the top one percent of all businesses in terms of longevity. He also considered that the taint of being labelled a racist business was unlikely to be overcome until at least a generation had passed. For the lost rental income, he looked at the decline in rental income that the Gibsons experienced after the events and the long time it would take to overcome being accused of racism. Finally, for the lost rental opportunities, he looked at the business plan that the Gibsons had for constructing additional rental properties that would have to be delayed or abandoned because of their reduced cash flow. Regarding causation, the

accountant testified that a multitude of things affected the business, including the protests and the resolution, but he opined that it was Oberlin's actions that caused the Gibsons' losses.

{¶108} The Gibsons also called a professor of marketing who focuses on consumer behavior and who had 25 years of experience. Addressing negative word-of-mouth, she testified that such communications have a much greater effect than positive word-of-mouth and have twice the effect on revenue. She also testified that it is much harder to counteract negative word-of-mouth, supporting the accountant's opinion about the lasting effects Oberlin's labelling of the Gibsons would have on their businesses. Upon review of the record, we conclude that the economic loss caused by Oberlin's conduct was not speculative. We also cannot say that the jury lost its way when it chose to believe the testimony of the accountant about the amount of the damages. *See Certain Care, LLC v. Mikitka*, 9th Dist. Lorain No. 19CA011544, 2020-Ohio-3544, ¶ 13-14.

{¶109} Oberlin next asserts that the noneconomic part of the damage award should have been capped at $350,000 for each plaintiff instead of $350,000 for each claim. It does not develop an argument in support of this contention in its initial brief, however, except for citing part of the language of R.C. 2315.18(B)(2). The appellant has the burden of demonstrating error on appeal. *See* App.R. 16(A)(7); former Loc.R. 7(B)(7). "It is the duty of the appellant, not this [C]ourt to demonstrate [the] assigned error through an argument that is supported by citations to legal authority and facts in the record." *State v. Mastice,* 9th Dist. Wayne No. 06CA0050, 2007-Ohio-4107, ¶ 7, quoting *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999 WL 61619, *3 (Feb. 9, 1999); *see also*, App.R. 16(A)(7); former Loc.R. 7(B)(7). Accordingly, this Court will not make an argument for Oberlin.

### D. Punitive Damages

{¶110} Oberlin next argues that the punitive damages award must be capped at twice the amount of the capped compensatory damages award instead of twice the amount the jury initially awarded as compensatory damages. The Gibsons argue that R.C. 2315.21(B)(2) is clear that punitive damages are capped at two-times the amount awarded by the jury and that the total is not affected by any statutory caps on compensatory damages.

{¶111} Under R.C. 2315.21(D)(1), "the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages." R.C. 2315.21(D)(2)(a) provides that the "court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant, as determined pursuant to [subsection] (B)(2) or (3) of this section." Subsection (B)(2) applies to cases that are tried to a jury and provides that, if a plaintiff makes a claim for both compensatory and punitive damages, "the court shall instruct the jury to return, and the jury shall return, a general verdict and, if that verdict is in favor of the plaintiff, answers to an interrogatory that specifies the total compensatory damages recoverable by the plaintiff from each defendant." R.C. 2315.21(B)(2).

{¶112} According to Oberlin, the amount recoverable under R.C. 2315.21(B)(2) embraces the caps on recovery established by law under R.C. 2315.18. Specifically, R.C. 2315.18(E)(1) provides in relevant part that "in no event shall a judgment for compensatory damages for noneconomic loss exceed the maximum recoverable amount that represents damages for noneconomic loss as provided in division (B)(2) of this section."

{¶113} The plain language of R.C. 2315.21(D)(2)(a) sets the cap on punitive damages in a jury case at two times the amount of compensatory damages "determined pursuant to [R.C.

2315.21(B)(2)] * * *." The statute does not contain any language capping the award based on the maximum recoverable amount as determined by R.C. 2315.18. Instead, R.C. 2315.21(B)(2) directs the court to have the jury return a general verdict and, if it is for the plaintiff, to have the jury answer an interrogatory that specifies the amount recoverable from each defendant. There is no language limiting a jury's general verdict to the amounts recoverable under R.C. 2315.18. Thus, upon review of R.C. 2315.21, we conclude that the trial court did not err when it capped the punitive damages award at twice the jury's uncapped compensatory damages award. *Faieta v. World Harvest Church*, 10th Dist. Franklin No. 08AP-527, 2008-Ohio-6959, ¶ 90 (concluding that R.C. 2315.21's provisions "refer to the uncapped, total compensatory damages the jury awarded."). For the reasons above, Oberlin's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ENHANCING [GIBSON'S] ATTORNEY FEES AWARD.

{¶114} In its third assignment of error, Oberlin argues this Court should vacate the enhancement that was added to the attorney fees lodestar.[4] Oberlin, in making this argument, suggests the Supreme Court of Ohio's recent decision in *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, establishes the trial court enhanced the award based on improper factors. Oberlin specifically argues that the trial court did not identify any objective and specific evidence to warrant an enhancement and, therefore, the enhancement should be vacated.

---

[4] The lodestar is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (Internal quotations and citations omitted.) *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, ¶ 10.

{¶115} In *Phoenix Lighting*, the Supreme Court of Ohio noted that its decisions regarding reasonable attorney fees had been guided over time by the decisions of the United States Supreme Court. *Id*. at ¶ 10. The Court explained that the determination regarding reasonable attorney fees usually begins with the lodestar amount. *Id*. It also explained that in prior cases it had held that the lodestar could be adjusted up or down after applying the factors identified in Prof.Cond.R. 1.5(a). *Phoenix Lighting* at ¶ 12. The Court recognized, however, that the United States Supreme Court had more recently backed away from enhancements because many of the factors supporting an adjustment were already accounted for in the initial lodestar computation. *Id*. at ¶ 16. In so doing, the *Phoenix Lighting* Court concluded:

> There is a strong presumption that the reasonable hourly rate multiplied by the number of hours worked, which is sometimes referred to as the "lodestar," is the proper amount for an attorney-fee award. Enhancements to the lodestar should be granted rarely and are appropriate when an attorney produces objective and specific evidence that an enhancement of the lodestar is necessary to account for a factor not already subsumed in the lodestar calculation.

> A trial court has discretion to modify the presumptive calculation of an attorney-fee award – the reasonable hourly rate multiplied by the number of hours worked – but any modification must be accompanied by a rationale justifying the modification.

*Phoenix Lighting* at paragraphs one and two of the syllabus.

{¶116} In their application for attorney fees, the Gibsons argued they should be awarded the lodestar with a two to three multiplier enhancement. Initially, they argued that a lodestar of $4,855,856 was appropriate. The Gibsons noted the complexity and magnitude of the case, the five-week trial with another week just arguing motions, the 33 witnesses called, the contentiousness and complexity of discovery and pre-trial issues, the hundreds of thousands of documents exchanged, and the numerous pre-trial motions. The Gibsons also noted that many of the hours their attorneys spent on the case were because of Oberlin's actions, such as the 32

depositions Oberlin took, some of which lasted up to five days. Further, the Gibsons indicated that Oberlin had also filed 17 motions and 16 motions in limine. The Gibsons also argued that the hourly rates charged by their attorneys and their attorneys' staff were reasonable.

{¶117} Regarding enhancement of the lodestar, the Gibsons argued the case was time and labor intensive, involved complex substantive and procedural issues that were intertwined among the plaintiffs, precluded the attorneys from taking other work, involved a substantial amount of money, was justified by the results, required substantial experience and ability, and was accepted on a contingency fee basis that equated to $10,000,000 in attorney fees. Oberlin, on the other hand, argued the lodestar was unreasonable, that the enhancement factors listed in Prof.Cond.R. 1.5(a) were already part of the lodestar calculation, and the enhancement should be reserved for rare and exceptional circumstances.

{¶118} In awarding attorney fees, the trial court employed a two-step method. Regarding the lodestar, it found that a reasonable average hourly rate in the community given the complexity of the issues and experience of the attorneys handling the case was $290 per hour. The trial court did not have any concern with the number of hours spent on the case and determined that it was not possible to separate the time the attorneys had spent on the recoverable punitive damages claims versus the non-recoverable punitive damages claims. The trial court, therefore, found that the 14,417 hours that the Gibsons' counsel spent on the case was reasonable. Applying the hourly rate to the number of hours expended resulted in a lodestar of $4,180,930.

{¶119} As to enhancement of the lodestar, the trial court examined the factors outlined in Prof.Cond.R. 1.5(a). It considered Oberlin's argument that those factors were subsumed in the lodestar calculation. However, regarding the time and labor involved, the novelty and difficulty of the issues, and the skill required to perform the legal services properly, the trial court found that

factor was not entirely subsumed by the lodestar because of the "extraordinary challenges" faced by the Gibsons. The trial court concluded that, although the experience, reputation, and ability of the Gibsons' attorneys was part of the lodestar calculation, when considered with other factors such as the fee customarily charged in the locality, the amounts involved in the case, the results obtained, and whether the fee was fixed or contingent, a multiplier of one and a half was appropriate and necessary for the attorneys' fee award. It, therefore, awarded the Gibsons $6,271,395 in attorney fees.

{¶120} Although the trial court's decision to award the Gibsons an enhancement of the lodestar pre-dated *Phoenix Lighting*, the trial court's analysis is consistent with *Phoenix Lighting*. Like the Ohio Supreme Court did in *Phoenix Lighting*, the trial court, here, specifically considered the United State Supreme Court's decision in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) stating:

> In *Perdue*, the Supreme Court * * * opined that the lodestar amount is presumptively reasonable and that enhancements (or multipliers) should not be based on factors that are accounted for in the lodestar analysis. * * * It follows then, that the [c]ourt in its discretion can adjust the lodestar amount upward or downward, if the 1.5(a) factors are not entirely subsumed within the lodestar calculation.

As previously indicated, the trial court, in its judgment entry, not only determined several factors were not entirely subsumed by the lodestar, but also determined the "case presented extraordinary challenges" to the Gibsons. Thus, based upon the trial court's rationale in justifying the upward lodestar modification, which is consistent with the analysis in *Phoenix Lighting*, this Court cannot determine the trial court abused its discretion.

{¶121} Oberlin's third assignment of error is overruled.

**CROSS-ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED WHEN IT APPLIED THE PUNITIVE DAMAGE CAPS CONTAINED IN [R.C.] 2315.21 TO THE FACTS OF THIS CASE.

**{¶122}** In their cross-appeal, the Gibsons assign as error that the trial court should not have placed a cap on the punitive damages that the jury awarded them. They argue that the cap of twice the compensatory damages is unconstitutional as applied to the facts of this case because it does not allow the punitive damages to accomplish their purpose. Specifically, they argue that the punitive damages cap violates the due process clause and their right to a trial by jury.

**{¶123}** "A regularly enacted statute of Ohio is presumed to be constitutional and is therefore entitled to the benefit of every presumption in favor of its constitutionality. That presumption of validity of such legislative enactment cannot be overcome unless it appear[s] that there is a clear conflict between the legislation in question and some particular provision or provisions of the Constitution." (Internal citations and quotations omitted.) *State v. Cook*, 83 Ohio St.3d 404, 409 (1998), *superseded by statute on other grounds as stated in State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374. "[If] an act is challenged on the ground that it is unconstitutional when applied to a particular state of facts, the burden rests upon the party making such attack to present clear and convincing evidence of a presently existing state of facts which makes the act unconstitutional and void when applied thereto." *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329 (1944), paragraph six of the syllabus. "The determination whether a statute * * * is constitutional is a question of law that we review de novo." *Crutchfield Corp. v. Testa*, 151 Ohio St.3d 278, 2016-Ohio-7760, ¶ 16.

**{¶124}** The Gibsons note that the jury initially awarded them $11,074,500 in compensatory damages and $33,223,500 in punitive damages. They assert that the jury's punitive damages award represents less than three percent of Oberlin's total assets. Noting that the purpose of punitive

damages is to appropriately punish and deter defendants, the Gibsons argue that a purely mathematical application of the caps thwarts those purposes. They also argue that applying the cap in their case bears no rational connection to the public welfare or a rational connection to Oberlin's wrongful conduct. They further argue that the punitive damages cap violates their right to a trial by jury.

{¶125} Regarding due process, the Ohio Supreme Court has held that "[a] legislative enactment will be deemed valid on due process grounds ' * * * [1] if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary.'" *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 274 (1986), quoting *Benjamin v. Columbus*, 167 Ohio St. 103 (1957), paragraph five of the syllabus. The Gibsons' argument asks this Court to measure whether the caps on punitive damages are in accordance with the purpose of punitive damages. "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 651 (1994). "[A] punitive damages award is more about a defendant's behavior than the plaintiff's loss." *Wightman v. Consol. Rail Corp.*, 86 Ohio St.3d 431, 439 (1999). "The focus of the award should be the defendant, and the consideration should be what it will take to bring about the twin aims of punishment and deterrence as to that defendant." *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, ¶ 178.

{¶126} Whether the punitive damages cap advances the purpose of punitive damages, however, is not the issue before this Court. Instead, because the Gibsons' challenge is to the validity of the cap, we must address whether the cap bears a real and substantial relation to the public health, safety, morals, or general welfare of the public. Specifically, because the Gibsons have made an as applied challenge, we must examine whether the restriction that R.C. 2315.21

imposes on the amount the Gibsons may recover as punitive damages has a rational relationship to the general welfare of the public and is not arbitrary and unreasonable. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, at ¶ 99-104.

{¶127} In *Arbino*, the Ohio Supreme Court considered a facial constitutional challenge to R.C. 2315.21. The Court recounted the economic interests that the punitive damages cap intended to advance and concluded that R.C. 2315.21 bore "'a real and substantial relation' to the general welfare of the public." *Id*. at ¶ 101-102. In particular, the Court noted that the General Assembly decided that "the uncertainty and subjectivity associated with the civil justice system were harming the state's economy." *Id*. at ¶ 101. The cap on damages in R.C. 2315.21 "[was] an attempt to limit the subjective process of punitive-damages calculation, something the General Assembly believed was contributing to the uncertainty." *Id*. Reviewing the legislative record, the *Arbino* Court concluded that the placement of limits on punitive damages bore a real and substantial relation to the economic interest of having a more predictable civil justice system. *Id*. at ¶ 102. To be clear, in *Arbino*, the Ohio Supreme Court concluded that the legislature's public policy goal was to promote economic stability by fostering a more predictable and reliable litigation environment and that the caps have a rational relationship to the general welfare of the public and are not arbitrary and unreasonable. *Id*. at ¶ 99-104.

{¶128} The Gibsons argue that the cap's mathematical formula does not strike a balance between the financial wherewithal of the college and an amount that would be proper to punish and deter it. They argue that imposition of the cap in this case, in effect, permits a billion-dollar institution to treat its tortious conduct as nothing more than a cost of doing business and allows it to continue such conduct. They note that reports by Oberlin's administration concluded that the outcome of this case would not have a material adverse effect on how Oberlin operates or a

material effect on its financial position. According to the Gibsons, imposition of the cap under these circumstances negates the community jury's ability to punish and deter Oberlin and does not serve the interests that punitive damages are intended to address.

{¶129} The Gibsons' argument, however, focuses exclusively on whether application of the cap in this case advances the purposes of punitive damages instead of the purposes of the punitive damages cap. They have not alleged that the application of the punitive damages cap in this case is inconsistent with the economic goals that the *Arbino* court determined R.C. 2315.21 intended to advance. In fact, the Gibsons have not even addressed any of the public policy interests underlying the statute recounted by the Ohio Supreme Court in *Arbino* and they have not attempted to establish that those interests are not advanced here by the application of the punitive damages cap. We, therefore, must conclude, in light of *Arbino*, that the Gibsons have not established by clear and convincing evidence that, as applied in this case, R.C. 2315.21 bears no real and substantial relation to the general welfare of the public or is arbitrary and unreasonable. *See also Simpkins v. Grace Brethren Church of Delaware, Ohio*, 149 Ohio St.3d 307, 2016-Ohio-8118, ¶ 38 ("[T]he status of a plaintiff does not diminish either the economic benefits of limiting noneconomic damages, as found by the General Assembly, or the substantial relationship that we found in *Arbino* between the statutory limitations and the benefits to the general public welfare.").

{¶130} To the extent that the Gibsons argue that the reduced punitive damages award is inadequate, they have failed to establish that they have a constitutionally cognizable right to a particular degree of punitive damages. The Ohio Supreme Court has recognized that defendants who are subject to punitive damages have a fundamental right to fairness, which requires that they receive notice of the severity of the penalty the State may impose for their conduct. *Dardinger*, 98 Ohio St.3d 77, 2002-Ohio-7113, at ¶ 152. "A lack of fair notice may render a sanction 'grossly

excessive' and thus unconstitutional." *Id*. at ¶ 154, quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Whether a defendant has received adequate notice of a possible punitive damages sanction is indicated by three guideposts: the reprehensibility of the defendant's conduct, the disparity between the harm suffered and the amount of the damages, and the difference between the punitive damages awarded in that case and the civil or criminal penalties authorized or imposed in similar cases. *Dardinger* at 153, citing *Wightman*, 86 Ohio St.3d at 439-440. The Gibsons have not identified any authority that indicates that there is a comparable right for plaintiffs concerning alleged grossly inadequate punitive damages. As such, this Court will not address whether the capped punitive damages award was sufficient to punish Oberlin or deter it from engaging in similar conduct in the future.

**{¶131}** Regarding the Gibsons' right to a trial by jury, in *Arbino,* the Ohio Supreme Court noted that the right to a jury trial is not absolute. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, at ¶ 32. It explained that, although a jury's fact-finding function is protected under the Constitution, that "does not mean jury awards are insulated from all outside influences." *Id*. at ¶ 36. Specifically, "a court may apply the law to change a jury award of damages without running afoul of the Constitution." *Id*. at ¶ 38. Regarding the noneconomic damages cap that was at issue in that case, the Court explained that, "[b]y limiting noneconomic damages for all but the most serious injuries, the General Assembly made a policy choice that noneconomic damages exceeding set amounts are not in the best interest of the citizens of Ohio." *Id*. at ¶ 40. When courts "simply apply the limits as a matter of law to the facts found by the jury[,] they do not alter the findings of facts themselves, thus avoiding constitutional conflicts." *Id*.

**{¶132}** The Gibsons do not allege any jury trial right that is different in their case from the rights that were at issue in *Arbino*. Upon review of the record, we must conclude that the Gibsons

have failed to establish that the imposition of the punitive damages cap infringed on their constitutional rights. The Gibsons' assignment of error is overruled.

## III.

**{¶133}** Oberlin's assignments of error are overruled. The Gibsons' sole assignment of error in their cross-appeal is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to Appellants/Cross-Appellees and Appellees/Cross-Appellants.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
CONCUR.


APPEARANCES:

BENJAMIN C. SASSE, Attorney at Law, for Appellants/Cross-Appellees.

RONALD D. HOLMAN, II and JULIE A. CROCKER, Attorneys at Law, for Appellants/Cross-Appellees.

RICHARD D. PANZA, MATTHEW W. NAKON, and RACHELLE KUZNICKI ZIDAR, Attorneys at Law, for Appellants/Cross-Appellees.

SETH D. BERLIN and JOSEPH SLAUGHTER, Attorneys at Law, for Appellants/Cross-Appellees.

TERRY A. MOORE, JACQUELINE BOLLAS CALDWELL, OWEN J. RARRIC, and MATTHEW W. ONEST, Attorneys at Law, for Appellees/Cross-Appellants.

LEE E. PLAKAS and BRANDON W. MCHUGH, Attorneys at Law, for Appellees/Cross-Appellants.

JAMES N. TAYLOR, Attorney at Law, for Appellees/Cross-Appellants.

MARY HYDE and LEONARD M. NIEHOFF, Attorneys at Law, for Amicus Curiae, The First Amendment Scholars.

CARL JAMES, Attorney at Law, for Amicus Curiae, The National Association for the Advancement of Colored People.

ISHAN K. BHABHA, Attorney at Law, for Amicus Curiae, The National Association for the Advancement of Colored People.

KEVIN T. SHOOK, Attorney at Law, for Amici Curiae, National Coalition Against Censorship, Brechner Center for Freedom of Information, Defending Rights & Dissent, and DKT Liberty Project.

BRUCE E. H. JOHNSON, Attorney at Law, for Amici Curiae, National Coalition Against Censorship, Brechner Center for Freedom of Information, Defending Rights & Dissent, and DKT Liberty Project.

MELISSA D. BERTKE, Attorney at Law, for Amici Curiae, The Reporters Committee for Freedom of the Press, Freedom to Read Foundation, American Booksellers Association, and 19 Media Organizations.